OUTTEN & GOLDEN LLP
Tammy Marzigliano
Aliaksandra Ramanenka
Amy Biegelsen
685 Third Avenue, 25th Floor
New York, NY 10017

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC BIEBER,<br><br>                Plaintiff,<br><br>      v.<br><br>CAYUGA CAPITAL MANAGEMENT, LLC,<br>SEA WOLF SERVICES, LLC, JACOB SACKS,<br>and JAMES WISEMAN,<br><br>                Defendants. | Case No.   21-cv-5268<br><br>**COMPLAINT<br>AND JURY DEMAND** |

## NATURE OF THE ACTION

1. Plaintiff Eric Bieber, by and through his attorneys Outten & Golden LLP, brings this action against Defendants Cayuga Capital Management LLC ("CCM"), Sea Wolf Services LLC ("Sea Wolf Services"), Jacob Sacks, and James Wiseman for violating the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h).

2. From April 2015 to June 2021, Mr. Bieber helped manage the trendy Brooklyn- and Queens-based restaurants and motel that Defendants own and operate. During that time, he received raises and promotions, and ascended to the role of Director of Operations.

3. Starting in March 2020, Mr. Bieber also helped Defendants and their businesses

survive the pandemic. During that time, Defendants laid off dozens of employees and cut Mr. Bieber's salary. To help weather the downturn, Defendant Sea Wolf Services obtained a Paycheck Protection Program loan from the federal government. Mr. Bieber learned that Defendants used the loan proceeds to pay their friends, family and business associates – none of whom he believed performed any work for Sea Wolf Services. When Mr. Bieber reported to Defendants that he believed this spending amounted to fraud on the government, Defendants began a campaign of retaliation against Mr. Bieber and ultimately terminated his employment.

## JURISDICTION AND VENUE

4. This case arises under a federal statute, the False Claims Act, 31 U.S.C. § 3729 *et seq*. Therefore, this Court has original jurisdiction of this matter pursuant to 28 U.S.C. §1331.

5. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions in this action occurred within the Eastern District of New York.

## PARTIES

Plaintiff Eric Bieber

6. Plaintiff Eric Bieber resides in Queens, New York.

7. At all relevant times, Mr. Bieber was Defendants' employee within the meaning of the False Claims Act.

Defendants Cayuga Capital Management LLC, Mr. Sacks, and Mr. Wiseman

8. Defendant Cayuga Capital Management LLC ("CCM") is a limited liability company, with its principal place of business in Brooklyn, NY.

9. CCM is a real estate developer and manager, owned and operated by Jacob Sacks and James ("Jamie") Wiseman.

10. Upon information and belief, CCM and/or Mr. Sacks and Mr. Wiseman are the ultimate owners and/or managers of the operating LLCs that Mr. Sacks and Mr. Wiseman have established for the restaurants they own, including Sea Wolf – Bushwick at 19 Wyckoff Ave, Brooklyn, NY 11237.

11. During all relevant times, Defendants CCM, Mr. Sacks, and Mr. Wiseman employed Mr. Bieber at their restaurant locations in Brooklyn and Queens, New York.

12. Mr. Sacks and Mr. Wiseman hired Mr. Bieber in 2015.

13. Mr. Sacks and Mr. Wiseman terminated Mr. Bieber's employment in 2021.

14. During all relevant times, Mr. Sacks and Mr. Wiseman controlled the manner and means by which Mr. Bieber performed his work, and provided his pay and benefits.

Sea Wolf Services LLC

15. Defendant Sea Wolf Services LLC is a New York limited liability company with its principal place of business in Brooklyn, NY.

16. Mr. Wiseman and Mr. Sacks are members and managers of Sea Wolf Services LLC.

17. Sea Wolf Services LLC was created in 2016 to employ the staff working at Sea Wolf – Bushwick located in Brooklyn, NY.

18. Sea Wolf Services issued Mr. Bieber's paychecks from May 2020 until his employment was terminated.

**FACTUAL ALLEGATIONS**

Background

19. Mr. Bieber has over 25 years of experience in the restaurant and hospitality industry, and has spent the last decade in the New York City market.

20. Mr. Bieber holds a Bachelor of Science degree in Industrial Design from Philadelphia University and studied at The American Sommelier in New York City. He has worked in winemaking and harvesting in Priorat, Spain and several high-profile New York institutions including at the pioneering restaurant DuMont in Williamsburg; at celebrity Chef Geoffrey Zakarian's The National in Midtown; and for the Denihan Hospitality Group, which owns and operates luxury and boutique hotels.

21. In April 2015, Mr. Sacks and Mr. Wiseman hired Mr. Bieber as the general manager of their hotel and restaurant – the Playland Motel.

22. Mr. Bieber's initial training occurred at the CCM office.

23. By May 2016, Mr. Bieber was overseeing the renovation of the Playland Motel, managing a second restaurant (Playland Grill), and launching a third (Sea Wolf – Bushwick). Mr. Sacks and Mr. Wiseman acknowledged his work with a significant raise.

24. Over the next three years, Mr. Sacks and Mr. Wiseman gave Mr. Bieber increasing responsibilities, including launching and managing two additional restaurants – The Ledge and Gemelli.

25. In the spring of 2019, Mr. Sacks and Mr. Wiseman formally gave Mr. Bieber the title of Director of Operations. By that time he was managing three of their restaurants while working on opening two new Sea Wolf locations: Sea Wolf Waterfront and Snow Wolf. That summer, Mr. Bieber helped them open a third new restaurant, JJ's Hideaway.

26. When Mr. Sacks and Mr. Wiseman promoted Mr. Bieber in 2019, they hired general managers for the restaurants that Mr. Bieber had been running, and Mr. Bieber supervised those new general managers.

27. Upon promoting Mr. Bieber to Director of Operations, Mr. Sacks and Mr.

Wiseman began paying him a percentage of some restaurants' revenue as part of his compensation.

28. As Director of Operations, Mr. Bieber began attending weekly, and then bi-weekly management meetings at CCM's offices with Mr. Sacks and Mr. Wiseman.

29. Mr. Bieber was responsible for submitting weekly payroll statements to an accountant in the CCM office. In addition to a payroll statement breaking out each employee's hours, Mr. Bieber would submit a check request report that designated how much money should be paid out of which of the operating LLCs that Defendants maintained for their several restaurants. As part of his job, Mr. Bieber had access to the Defendants' centralized payroll software database, which archived current and historic payments to the restaurant employees.

30. Throughout Mr. Bieber's tenure, Defendant Sea Wolf Services issued paychecks exclusively to the Sea Wolf – Bushwick employees.

Mr. Bieber Discovered What He Believed Was Fraud on the Government

31. On or around March 16, 2020, in response to the COVID-19 pandemic, Defendants shut down three restaurants, laid off approximately 100 employees, and reduced salaries for the staff that remained.

32. As of March 16, 2020, Sea Wolf – Bushwick was the only restaurant still operating.

33. Defendants retained Mr. Bieber who continued to run Sea Wolf – Bushwick during the pandemic.

34. In the early weeks of the pandemic, Defendants significantly reduced Mr. Bieber's salary.

35. Despite this reduction in salary and the unprecedented impact of COVID-19 on

5

the restaurant industry, Mr. Bieber continued to keep Sea Wolf – Bushwick operational, managed payroll, and supervised staff.

36. During this time, Mr. Bieber also continued to work towards opening two new Sea Wolf locations – Sea Wolf Waterfront and Snow Wolf – which he was able to launch in July 2020.

37. In March 2020, CCM's office staff began to work remotely rather than out of CCM's office. Before then, Mr. Bieber or another manager would go to CCM's office to collect paychecks and distribute them to employees each week. In March 2020, Defendants asked the payroll processing company to mail the paychecks directly to Mr. Bieber's attention at the Sea Wolf – Bushwick location (the only restaurant operating at the time) for him to distribute.

38. On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, which, in part, created the Paycheck Protection Program ("PPP") allowing the federal Small Business Administration to fund business loans. The PPP funds were intended to help businesses retain their workforce during the COVID-19 crisis. As an incentive to do so, the loans are forgivable if a business uses the PPP funds to pay employee wages.

39. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application to the Small Business Administration. The PPP loan application requires the business to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including its average monthly payroll expenses and number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the loan. In addition, businesses applying for a PPP loan must provide documentation to the lending institution showing their current payroll expenses.

40. As soon as the PPP program was announced, Mr. Sacks and Mr. Wiseman

informed Mr. Bieber that they intended to apply for funds.

41. In the first week in May 2020, Defendants resumed the pre-pandemic practice of having the paychecks delivered to the CCM office for Mr. Bieber (the only remaining full time manager) to retrieve and distribute.

42. Also in the first week in May 2020, although he was still responsible for retrieving physical checks from the CCM offices, Mr. Bieber received his weekly salary as a direct deposit from Sea Wolf Services LLC. This was the first time his pay had come from that entity.

43. In or around May 2020, Sea Wolf Services secured a PPP loan from the federal Small Business Association.

44. On information and belief, the PPP loan that Sea Wolf Services obtained was between $350,000 and $1,000,000.

45. Although Sea Wolf Services had received the loan, Defendants did not restore Mr. Bieber's compensation to the pre-pandemic levels. Mr. Bieber inquired when that would happen and Defendants assured him it would as the business stabilized.

46. On or around June 10, 2020, a little over a month after the PPP loan was distributed to Sea Wolf Services, Mr. Bieber noticed that the roster of employees in the payroll database included eight individuals who did not work at any of the restaurants, but had personal connections to Mr. Wiseman and Mr. Sacks, including business partners and relatives (collectively "the PPP Recipients").

47. Physical paychecks for those eight new PPP Recipients were never included in the bundle that Mr. Bieber retrieved each week from the CCM office.

48. Because Mr. Bieber had long been responsible for payroll across the restaurants

and across the LLCs, he knew that none of the PPP Recipients had been employed by any of the restaurants he had managed for Defendants. And because Sea Wolf – Bushwick was the only restaurant operating at that time, and he was managing it, Mr. Bieber knew none of the PPP Recipients were working for the restaurant at the time.

49. Mr. Bieber was concerned by the sudden expansion of the payroll roster particularly since it came just after Defendants secured the PPP loan.

50. In January 2021, Mr. Bieber was asked to distribute the employee's 2020 W-2 forms.

51. When Mr. Bieber reviewed the W-2 forms, he discovered that Sea Wolf Services had received W-2s for the PPP Recipients who had been added to the payroll only after the PPP loan came through, but who had not performed any work for the restaurant.

52. In or around February 2021, Defendants began making plans to resume normal operations in the spring, including reopening Sea Wolf Waterfront and Snow Wolf.

53. On or around February 25, 2021, Mr. Wiseman and Mr. Sacks informed Mr. Bieber that as Director of Operations Mr. Bieber would be responsible for reopening and initially managing Sea Wolf Waterfront and Snow Wolf and heading up a project to integrate xtraCHEF – a cloud-based finance and inventory management platform – into the restaurants' operations.

54. On February 26, 2021, Mr. Bieber informed Mr. Sacks and Mr. Wiseman via email that the W-2s reflecting payments to the PPP Recipients who had not worked for any restaurants worried him because he knew that they had received PPP Loans, which were earmarked for employee salaries.

55. In the February 26, 2021 email, Mr. Bieber informed Mr. Sacks and Mr. Wiseman that "[i]f these funds are being used to pay individuals who are not actual employees, I believe

that this is fraud against the Federal Government."

Defendants Were Aware of Mr. Bieber's Concerns about Fraud on the Government.

56. On February 27, 2021, Mr. Sacks emailed Mr. Bieber acknowledging that Mr. Bieber had "expressed strong concern about our participation in the PPP program." In response, Mr. Sacks stated that this "type of misguided rumor/gossip takes away from the focus on productivity and success we are working to instill[,]" and instructed Mr. Bieber that "[n]ext time if you have a question, rather than sending an inflammatory email I would suggest you set up a time to speak with me."

57. On March 3, 2021, Mr. Bieber sent another email to Mr. Sacks, stating that he did "not understand how your partners in other business ventures or family members are eligible to be receiving paychecks, especially when they were not on payroll before the [PPP] loan came through."

58. Later on March 3, 2021, Mr. Sacks responded in an email denying any wrongdoing, but confirming that Mr. Bieber had been "involved with helping manage the onsite operations of Seawolf Bushwick … in a capable way." He went on to say "[t]hen last week, on Thursday before your bizarre accusations began, we had a pleasant, lengthy conversation with you and informed you that your assignments were to get xtra[CHEF] up and running at Seawolf Bushwick and to begin preparing to reopen Seawolf Kent."

59. Mr. Sacks' March 3, 2021 email also asked Mr. Bieber to "[p]lease keep your bizarre accusations to yourself, if you say anything negative about Jamie and I to other employees, or potential future employees, that will be grounds for immediate dismissal."

60. Shortly after sending his first March 3, 2021 email, Mr. Sacks sent a second message that threatened Mr. Bieber with criminal prosecution and/or termination. The email

stated that if Mr. Bieber made "these claims to anyone else" it would amount to slander, which Mr. Sacks called "a serious crime and can have serious civil penalties including sometimes massive fines. If someone were to slander us, we would use all legal means to defend ourselves. So please don't go down that road. Thank you."

61. On March 11, 2021, Mr. Bieber emailed Mr. Sacks and Mr. Wiseman to say he would need to miss the weekly management meeting because he was getting his second dose of the COVID-19 vaccine. Mr. Sacks and Mr. Wiseman replied that they could skip the meeting, but rather than cancelling for that week Mr. Sacks removed all future weekly management calls from Mr. Bieber's calendar.

62. The following day, on March 12, 2021, Mr. Sacks and Mr. Wiseman continued the retaliation by hiring a new manager to oversee operations at Sea Wolf – Waterfront, which Mr. Bieber was previously tasked with opening and operating.

63. Mr. Sacks and Mr. Wiseman never informed Mr. Bieber that he would not be managing Sea Wolf – Waterfront. Instead, Mr. Bieber learned that he had been replaced through new entries in the the restaurants' schedule management software.

64. Three days later, on March 15, 2021, Mr. Bieber discovered that his electronic keys to the Sea Wolf – Waterfront and Snow Wolf locations had been deactivated.

65. The following day, on March 16, 2021, Mr. Sacks emailed Mr. Bieber to inform him that since he would be "tied up with [Defendants'] xtra[CHEF] project, from now on James [Everett] will receive payroll on Thursday/Friday when it arrives." Mr. Sacks went on to state that Mr. Bieber did not need to "bother with this anymore." This change effectively stripped Mr. Bieber of his payroll responsibilities.

66. Later on March 16, 2021, Mr. Bieber learned that Mr. Sacks and Mr. Wiseman

had in fact hired Mr. Everett as a new manager to take over Sea Wolf – Bushwick, the location Mr. Bieber was overseeing at the time. As a result, Mr. Bieber's responsibilities were severely diminished.

67. In late-March 2021, Mr. Bieber completed the xtraCHEF project. Although nearly all of his duties had been taken away, Defendants never restored his responsibilities or gave him new work after he completed the xtraCHEF project.

68. Over the next several months Mr. Bieber continued to seek clarification of his role, but was relegated to performing menial tasks, like rolling silverware in napkins. Mr. Bieber would try to help train new managers or assist as a floor manager when needed. However, because Mr. Bieber was locked out of key software systems (including for payroll, inventory, restaurant point of sale system, reservations, and online orders) he was of limited utility to his colleagues.

69. On May 10, 2021, Mr. Bieber emailed Mr. Sacks and Mr. Wiseman alerting them to a technical issue with Sea Wolf – Bushwick's online menu. Mr. Bieber raised this issue to Mr. Sacks and Mr. Wiseman noting that while he previously would have had the ability and access to solve this problem, because he had lost access and "manager level permissions shortly after [he] raised concerns about Sea Wolf's potential fraud on the government by misusing the PPP loan funds," he was now unable to do anything.

70. Mr. Sacks did not respond until May 12, 2021, and then only to tell Mr. Bieber that it was inappropriate to reach out to him, "an owner of the business," for this issue. Up until then, Mr. Bieber had reported directly to Mr. Sacks.

71. On May 25, 2021, Mr. Bieber alerted Mr. Sacks and Mr. Wiseman that several employees were missing cash tips from the previous weeks. Mr. Bieber went on to state that in

the past he would have been able to address the issue himself, but he was no longer able to since Mr. Sacks and Mr. Wiseman had limited his access to key software programs in retaliation for his raising concerns about the PPP loans.

72. In response, Mr. Sacks emailed Mr. Bieber later on May 25, 2021, removing yet another responsibility from him, stating "You are not in charge of handling tips."

73. On Wednesday, May 26, 2021, Mr. Villalona notified Mr. Bieber that his regular hours would be changing for the remainder of the summer and that he would now be expected to work weekends from 10 am to 8 pm – beginning that Friday, which was Memorial Day weekend.

74. Throughout his tenure working for Defendants, Mr. Bieber had always set his own schedule and had never been mandated to work weekends as part of his regular hours and job responsibilities.

75. Later on May 26, 2021, Mr. Bieber responded to Mr. Villalona noting that he had an existing conflict and would not be able to accommodate this sudden shift change.

76. In response, Mr. Villalona sent Mr. Bieber an email accusing him of refusing to work during the upcoming shift and stating that it was not "unreasonable for someone with a high salary like yours to work 50 hours a week." Mr. Villalona went on to state that Mr. Bieber would be entered into the scheduling system (on the dates he was unavailable) and that he had given Mr. Bieber "this advance notice as a courtesy. This is not a discussion, this is a notification of your new schedule."

77. On May 27, 2021, Mr. Bieber alerted Mr. Sacks and Mr. Wiseman that his plans could not change on such short notice, and that he had pre-existing out-of-state travel plans for the following weekend. He informed them that he viewed the sudden schedule change as another act of retaliation for his reporting concerns about the PPP loans.

78. On or around May 27, 2021, Mr. Bieber spoke in-person with Mr. Villalona, who stated that he himself was confused why Mr. Sacks and Mr. Wiseman were instructing him to email Mr. Bieber about his schedule, and that he was frustrated in not being able to use Mr. Bieber as a resource in managing Sea Wolf, despite Mr. Bieber's extensive knowledge and availability.

79. On May 28, 2021, Mr. Bieber emailed Mr. Sacks and Mr. Wiseman relaying the conversation he had with Mr. Villalona.

80. On May 29, 2021, Mr. Sacks responded to Mr. Bieber stating that he had not made any recent contributions to the customers or internal processes and that "if [Mr. Bieber] want to stay a part of the team," they expected to see "abrupt positive change in [his] attitude."

81. On June 3, 2021, Mr. Bieber sent a follow up email to Mr. Sacks rebutting his attacks on Mr. Bieber's performance, and stating that he believed he was "being singled out for this retaliatory treatment."

82. Three days later, on June 6, 2021, Mr. Sacks terminated Mr. Bieber's employment effective immediately, purportedly due to "work infractions and errors."

83. Defendants' conduct has caused Mr. Bieber to suffer significant economic harm, including lost wages and benefits.

84. Defendants' conduct has caused Mr. Bieber to suffer significant emotional distress, including but not limited to loss of sleep and increased anxiety.

### CAUSE OF ACTION
**Retaliation - Federal False Claims Act, 31 U.S.C. § 3730(h)**
**Against All Defendants**

85. Plaintiff incorporates, by reference, the allegations from each of the preceding paragraphs.

86. Plaintiff reported to Defendants his concern that their conduct amounted to fraud on the government.

87. Defendants understood Plaintiff to be reporting fraud on the government.

88. Plaintiff's reports caused Defendants to retaliate against him in the terms and conditions of his work, culminating in the termination of his employment.

89. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and will continue to suffer, economic and non-economic harm for which Defendants are liable, including but not limited to 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A. Declare the acts and practices complained of herein to be violations of the FCA;

B. Enjoin and permanently restrain these violations of the FCA;

C. Direct Defendants to reinstate Plaintiff into the position he held with the same seniority or a comparable position, or in the alternative, set Plaintiff's compensation and benefits at a comparable level to that position, or in the alternative, award front pay damages;

D. Award Plaintiff damages to make him whole for all earning he would have received but for Defendants' unlawful treatment, including, but not limited to, awarding Plaintiff two times the amount of back pay, profits sharing awards, benefits, health care coverage, and other lost benefits, on his cause of action in amounts to be determined at trial;

E. Award Plaintiff compensation for any special damages sustained as a result of the retaliation, in amounts to be determined at trial;

F. Award Plaintiff pre-judgment interest (continuing to accrue at a rate of 9% per year);

G. Award Plaintiff emotional distress damages;

H. Award Plaintiff attorneys' fees, costs, and disbursements pursuant to applicable law; and

I. Award such other legal and equitable relief as this Court deems necessary, just, and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
September 22, 2021

By:    */s/ Tammy Marzigliano*
Tammy Marzigliano
**OUTTEN & GOLDEN LLP**
Tammy Marzigliano
Aliaksandra Ramanenka
Amy Biegelsen
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000
TM@outtengolden.com
ARamanenka@outtengolden.com
ABiegelsen@outtengolden.com

*Attorneys for Plaintiff*